Matthew C. Helland (CA Bar No. 250451)
helland@nka.com
Daniel Brome (CA Bar No. 278915)
dbrome@nka.com
NICHOLS KASTER, LLP
235 Montgomery Street, Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

BRYAN SCHWARTZ LAW
Bryan J. Schwartz (CA Bar No. 209903)
Natasha T. Baker (CA Bar No. 319381)
Email: Bryan@bryanschwartzlaw.com
Natasha@bryanschwartzlaw.com
180 Grand Avenue, Suite 1380
Oakland, CA 94612
Telephone: (510) 444-9300
Facsimile: (510) 444-9301

*Attorneys for Plaintiffs and Putative*
*Class and Collective Action Members*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARRIETT MITCHELL, JASON SUMMERS and JOSEPH ADAMS, individually, on behalf of others similarly situated, and on behalf of the general public,<br><br>                    Plaintiffs,<br><br>    vs.<br><br>CORELOGIC VALUATION SOLUTIONS, INC., and DOES 1-10, inclusive<br><br>                    Defendants. | Case No. 8:17-cv-02274-DOC-DFM<br>**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR ORDER OF DEFAULT, FINDING OF JURISDICTION, AND FOR SANCTIONS**<br><br>Judge:   Hon. David O. Carter<br><br>Date:   December 9, 2019<br>Time:  8:30 a.m.<br>Place:  Courtroom 9D |

PLAINTIFFS' REPLY MEM. SUPP. MOT. FOR DEFAULT, JURISDICTION AND SANCTIONS

1

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................1

II.  ARGUMENT .....................................................................................4

A.  CoreLogic Defaulted on its Obligation to Arbitrate ...........................4

B.  CoreLogic Had No Right to Adjudication of its "Threshold Issues" by a Special Master or Other "Reasonable Procedure" ..................................................6

C.  CoreLogic Provides No Support for its Contention that Counsel Committed Ethical Violations in Non-Florida States ...............................................8

D.  There is no Support for the Argument that Delayed Filings in Florida Permanently Disqualifies Counsel ....................................................10

E.  Sanctions are Warranted for CoreLogic's Violations of this Court's Orders and its Bad Faith Litigation Tactics ..................................................13

    i.   CoreLogic violated this Court's orders by refusing to participate in the arbitrations ..................................................................................13

    ii.  CoreLogic litigated in bad faith by refusing to arbitrate in non-Florida states without any support for its UPL allegations ...........................14

    iii. CoreLogic's flawed ethical justifications do not excuse its willful violation of this Court's orders .........................................................15

F.  CoreLogic's Insistence that it was Justified in Exiting Arbitration Renders its Promise to Arbitrate Illusory and Unenforceable ...............................18

III. CONCLUSION ................................................................................18

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3
*Armendariz v. Foundation Health Psychcare Servs., Inc.*, 24 Cal. 4th 83 (2000).....7

4
*AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643 (1986).................6

5
*Brown v. Dillard's Inc.*, 430 F.3d 1004 (9th Cir. 2005).......................................5, 17

6
*In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361 (9th Cir. 1987)..............15

7
*Marchand v. Northrop Grumman Corp.*, 2017 WL 2633132

8
  (N.D. Cal. June 19, 2017) ......................................................................................5

9
*McLellan v. Fitbit, Inc.* 2018 WL 3549042

10
   (N.D. Cal. July 24, 2018) .....................................................................................17

11
*Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257 (9th Cir. 2006) ...............................18

12
*Pre-Paid Legal Servs., Inc. v. Cahill*, 786 F.3d 1287(10th Cir. 2015) .................4, 6

13
*Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644 (9th Cir. 1997) ...............15

14
*Rapaport v. Soffer*, 2011 WL 1827147 (D. Nev. May 12, 2011).....................4, 5, 6

15
*Sink v. Aden Enters., Inc.*, 352 F.3d 1197(9th Cir. 2003) ....................................4, 6

16

17

**Rules**

18
Ariz. R. Prof. Cond. 5.5(c)........................................................................................9

19
Ariz. R. Prof. Cond. 5.5(d) .......................................................................................9

20
Ga. R. Prov. Cond. 5.5(c)(3).....................................................................................9

21
Ill. R. Prof. Cond. 5.5(c)(3) ......................................................................................9

22
Pa. R. Prof. Cond. Rule 5.5(c)(3) .............................................................................9

23

24

25

26

27

28

## I.   INTRODUCTION

CoreLogic asks: "***Why would counsel refuse to resolve the issue of their unauthorized practice of law if they did not engage in unethical conduct and resolution would remove any impediment to arbitration?***" The answer is simple: because CoreLogic's allegations regarding the unauthorized practice of law are, and always have been, a meritless sideshow aimed at disrupting and delaying litigation on the merits of Plaintiffs' claims.

CoreLogic cites no right—contractual, court-ordered, in the AAA rules, or otherwise—to have its threshold issues resolved by a special master prior to the arbitration of Plaintiffs' claims. Instead, CoreLogic's opposition consists mostly of name-calling and mudslinging, while avoiding the core issues in this motion: 1) whether CoreLogic's refusal to arbitrate Plaintiffs' claims constitutes a default on its Court-ordered obligation to arbitrate; 2) whether this Court should therefore resume jurisdiction over these Plaintiffs' claims; and 3) whether the Court should sanction CoreLogic for violating its orders and acting in bad faith. As Plaintiffs explained in their opening memorandum, a finding of default is appropriate because the AAA closed each of the 110 arbitrations due to CoreLogic's failure to pay. A finding of default is important to Plaintiffs because it will prevent CoreLogic from compelling arbitration with these Plaintiffs in the future. And a finding of default is necessary because it firmly establishes the basis for this Court to resume jurisdiction over these Plaintiffs' claims—which is *not* by agreement of the parties, but *only* because of CoreLogic's default. The Court should grant Plaintiffs' motion and sanction CoreLogic and/or its counsel for this willful violation of this Court's orders.

For all its bluster about the alleged unauthorize practice of law ("UPL"), CoreLogic's opposition only challenges Counsel's arbitration filings in one state—Florida—and CoreLogic does not dispute that Plaintiffs' Counsel began filing Verified Statements with the Florida bar promptly upon CoreLogic raising this

issue. According to CoreLogic, Counsel's brief delay in filing its Verified Statements (which was not due to any nefarious intent, but was because the form requests a case number and case numbers had not yet been assigned), constitutes cause for dismissing Florida arbitrations on the merits and justifies CoreLogic's refusal to participate. CoreLogic cites no authority on point.

Moreover, CoreLogic advances **no argument** justifying its default on the **84 non-Florida arbitrations**, the vast majority of which are filed in states allowing out-of-state counsel to participate in arbitration without any special filing procedures. Even CoreLogic's hired-gun ethicist was unwilling or unable to opine that Plaintiffs' Counsel engaged in the unauthorized practice of law as to these 84 arbitrations; indeed, Ms. Burke-Spencer readily admits that most states "permit out-of-state attorneys not licensed in the state to represent clients in arbitrations pending there . . . ." (*Id.* ¶ 9.) And CoreLogic does not explain its refusal to arbitrate in Oregon, where a representative from the state bar expressly asked Plaintiffs' Counsel to hold its out-of-state attorney forms until a case number was assigned, definitively answering the question of whether a delayed filing disqualifies counsel. CoreLogic defaulted on these 84 non-Florida arbitrations without any support for its UPL arguments in those states.

CoreLogic readily admits that it refused to arbitrate Plaintiffs' claims "*until the threshold issue of Counsel's unauthorized practice of law was determined.*" (ECF No. 279 at 22.) But the two orders from this Court compelling arbitration applied equally to CoreLogic as they did to Plaintiffs, and the orders leave no room for CoreLogic to set the preferred order of dispute resolution. CoreLogic obfuscates the issues by arguing that this Court did not specifically compel arbitration of CoreLogic's threshold issues, but that is not the point. The point is that the Court ordered Plaintiffs and CoreLogic to arbitrate, and those orders do not permit CoreLogic to unilaterally exit the process if it is not satisfied with the AAA's administration.

CoreLogic's bad faith is amplified by its position—expressed for the first time in its opposition—that individual arbitrators would not have contractual jurisdiction over CoreLogic's UPL allegations. Assuming that were true (and Plaintiffs tend to agree) illustrates a glaring flaw in CoreLogic's position: if an arbitrator lacks jurisdiction, then on what basis would a AAA special master take jurisdiction over the issue? And if a AAA special master has no contractual jurisdiction over the issue, then what justifies CoreLogic's refusal to arbitrate unless and until Plaintiffs' Counsel submits to CoreLogic's preferred dispute resolution mechanism? CoreLogic can argue until the cows come home that Plaintiffs' Counsel caused the "present circumstances" by its "refusal" to agree to a "reasonable" means of resolving CoreLogic's charges, but the record is clear that CoreLogic had no basis to impose that dispute resolution mechanism on Plaintiffs. Only one party—CoreLogic—defaulted on its court-ordered and contractual obligation to arbitrate.

CoreLogic's justification for its refusal to arbitrate hangs by the thread of its spurious argument that by *opposing* Plaintiffs' claims in arbitration, its counsel would be *assisting* Plaintiffs' Counsel in the unauthorized practice of law. One has no trouble imagining what this Court's response would be if a defaulting defendant, represented by counsel, argued that counsel was ethically prohibited from filing an answer to properly-served summons and complaint because its counsel disputed the opposing counsel's licensure. CoreLogic's obligation to appear and defend is no different in arbitration than it is in court.

California's legislature recently recognized that an employer's refusal to pay filing fees in arbitration "hinders the efficient resolution of disputes and contravenes public policy." SB 707 (available at https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200SB707) (last visited November 1, 2019). The legislature further recognized that:

> A company's strategic non-payment of fees and costs severely prejudices the ability of employees or consumers to vindicate their rights. This practice is particularly problematic and unfair when the party failing or refusing to pay those fees and costs is the party that imposed the obligation to arbitrate disputes.

*Id.* CoreLogic's refusal to arbitrate is an affront to this Court's judicial authority to control its proceedings and is contrary to important California public policy. The Court can, and should, sanction CoreLogic and its counsel for CoreLogic's unwarranted refusal to participate in arbitration, in willful violation of this Court's orders.

## II.   ARGUMENT

### A. CoreLogic Defaulted on its Obligation to Arbitrate

CoreLogic spends most of its opposition arguing that Plaintiffs' Counsel "are solely responsible for the present circumstances," while calling Plaintiffs' request for a default order holding CoreLogic at fault "frivolous and unnecessary." Def. Mem., ECF No. 279 at 16-17. The fault for AAA's case closures is precisely what is at issue in this motion, and the record leaves no doubt that the AAA closed the files because CoreLogic refused to pay any additional fees.

The question of whether CoreLogic defaulted in arbitration is "one of fact." *Sink v. Aden Enters., Inc.*, 352 F.3d 1197, 1199 (9th Cir. 2003). Here, the file closing letters each plainly advise that AAA was "closing [its] file in the above matter as Respondent has confirmed they will not remit payment for arbitrator compensation." (Helland Decl. Exh. 17, ECF No. 273-19.) Under these circumstances, it is appropriate for the Court to issue a finding that CoreLogic defaulted on its obligation to arbitrate. *See Sink*, 352 F.3d at 1199 (affirming the district court's conclusion that the defendant defaulted in arbitration by failing to pay filing fees); *Pre-Paid Legal Servs., Inc. v. Cahill*, 786 F.3d 1287, 1294 (10th Cir. 2015) ("Failure to pay arbitration fees constitutes a 'default' under § 3 [of the FAA]"); *Rapaport v. Soffer*, 2011 WL 1827147, at *2 (D. Nev. May 12, 2011) ("Since it was Soffer's failure to pay his portion of the fees that resulted in the

termination of the arbitration, this Court finds that Soffer is 'in default in proceeding with such arbitration' and Soffer therefore cannot bring a motion to stay pending arbitration under FAA").

In blaming Plaintiffs for the breakdown in arbitration, CoreLogic equates this case to *Marchand v. Northrop Grumman Corp.*, 2017 WL 2633132 (N.D. Cal. June 19, 2017). *See* Def. Mem., ECF No. 279, at 19-20. But *Marchland*, and CoreLogic's citation to it, reaffirm the importance of this Court's finding of default. In *Marchand*, the plaintiff voluntarily withdrew a demand for arbitration in favor of proceeding in court. *Id.* at *7. When the employer responded in court with a motion to compel arbitration, the employee, citing *Brown v. Dillard's Inc.*, 430 F.3d 1004 (9th Cir. 2005), argued that she could not be compelled to arbitrate because the employer should have insisted on arbitration at the time the employee withdrew the demand. *Marchand*, 2017 WL 2633132 at *7. The court disagreed, holding that the employee was responsible for terminating the arbitration, and that *Brown* therefore did not preclude a return to arbitration. *Id.* at *8. Accordingly, *Marchand* confirms that Plaintiffs could have been prejudiced by a voluntary stipulation to return to Court and that an order of default is necessary to preserve Plaintiffs' rights.[1]

CoreLogic is correct that the AAA did not use the term "default" when closing the files for CoreLogic's failure to pay, but that is the very reason Plaintiffs ask this Court to make such a finding. As the *Rapaport* court noted:

> Soffer may be correct that none of the evidence indicates that the arbitrator had formally entered an order of default against him due to his inability to pay the arbitration fees. However, the Ninth Circuit has consistently found that the failure by a party to pay fees in arbitration will prevent that party from successfully moving to compel arbitration in the same case in the future.

---

[1] CoreLogic's continued insistence that Plaintiffs' Counsel are fully responsible for CoreLogic's failure to participate in the arbitrations confirms that meet and confer efforts reached their terminus upon the crystallization of the parties' differences. It goes without saying that Plaintiffs do not believe this motion is frivolous or unnecessary, and that there is no basis to sanction Plaintiffs' Counsel for its filing.

*Rapaport*, 2011 WL 1827147, at *2. As the Ninth Circuit explained in *Sink*, a default in arbitration carries with it certain consequences under the FAA; chief among them is the defaulting party's loss of its right to compel arbitration. *See Sink*, 352 F.3d at 1201. It is wholly and entirely proper, therefore, for Plaintiffs to request a finding from this Court that CoreLogic defaulted on its obligation to arbitrate, and for the Court to retain jurisdiction over Plaintiffs' claims on that basis. *See Pre-Paid Legal Servs., Inc.*, 786 F.3d at 1296 (relying on *Sink* for the conclusion that a district court may make a finding of default in the absence of a formal finding of default by an arbitrator).[2] And because the record shows that the AAA heard and rejected CoreLogic's request for an early resolution of its threshold issues, and then closed the files based on CoreLogic's refusal to pay, the Court should find that CoreLogic defaulted on its obligation to arbitrate.

### B. CoreLogic Had No Right to Adjudication of its "Threshold Issues" by a Special Master or Other "Reasonable Procedure"

CoreLogic repeatedly attacks Plaintiffs' Counsel for refusing to agree to a special master or some other "reasonable" procedure for resolution of the UPL issues. Conspicuously absent from CoreLogic's opposition is any argument that it was entitled to resolution of its UPL charges under the procedure and timing of its choosing.

"[A]rbitration is a matter of contract . . . ." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). Accordingly, "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *Id.* at 648-49. It follows that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to

---

[2] The AAA, as is its policy, offered Plaintiffs the opportunity to pay CoreLogic's arbitration fees. However, Plaintiffs were under no obligation to do so, and California Supreme Court precedent prohibits placing that requirement on Plaintiffs. *See Armendariz v. Foundation Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 110-11 (2000).

submit." *Id.* at 648. Here, CoreLogic presents no argument that Plaintiffs were obligated to submit the UPL issue for resolution by a special master prior to CoreLogic participating in the arbitrations. Quite the opposite, in fact—CoreLogic now argues, for the first time, that individual arbitrators *had no contractual jurisdiction to resolve its UPL allegations. See* Def. Mem., ECF No. 279 at 17.[3] Yet CoreLogic does not explain by what authority a special master would have jurisdiction to resolve the issue, as no source of authority provides AAA special masters with broader jurisdiction than the arbitrator. CoreLogic's argument that individual arbitrators would have lacked jurisdiction reinforces its bad faith in pressing for resolution of this issue in arbitration and holding the arbitrations hostage in the interim.

In the end, the AAA properly recognized that its rules did not obligate Plaintiffs' Counsel to submit to a special master for collective resolution of CoreLogic's UPL chargers. That CoreLogic believes it would have been *reasonable* to resolve the UPL issue in front of a special master, and prior to litigation on the merits, is of no import. Absent some contractual or court-ordered obligation to litigate CoreLogic's preferred issues in arbitration, in front of a single decision-maker, and prior to litigation on the merits, Plaintiffs were well within their rights to refuse that procedure. CoreLogic, on the other hand, had no right to refuse to arbitrate, and therefore defaulted on its contractual and court-ordered obligation to do so.

---

[3] CoreLogic's arguments that the Court did not compel arbitration of the UPL issues, and that the UPL issue was not delegated to the arbitrator, are red herrings. The issue is not whether CoreLogic was obligated to arbitrate those issues, but whether CoreLogic was justified in refusing to arbitrate on the merits prior to resolution of those issues.

### C. CoreLogic Provides No Support for its Contention that Counsel Committed Ethical Violations in Non-Florida States

CoreLogic's opposition confirms that its broad UPL charges are meritless. Rule 5 of the Model Rules of Professional Conduct addresses the unauthorized practice of law. *See* Mod. R. Prof. Cond. 5.5.[4] Rule 5.5(c) contains specific provisions allowing out-of-state counsel to represent clients in arbitration:

> (c) A lawyer admitted in another United States jurisdiction, and not disbarred or suspended from practice in any jurisdiction, may provide legal services on a temporary basis in this jurisdiction that:
>
> . . .
>
> > (3) are in or reasonably related to a pending or potential arbitration, mediation, or other alternative resolution proceeding in this or another jurisdiction, if the services arise out of or are reasonably related to the lawyer's practice in a jurisdiction in which the lawyer is admitted to practice and are not services for which the forum requires pro hac vice admission;

Mod. R. Prof. Cond. 5.5(c). The comments to the rule provide:

> Paragraphs (c)(3) and (c)(4) require that the services arise out of or be reasonably related to the lawyer's practice in a jurisdiction in which the lawyer is admitted. A variety of factors evidence such a relationship. . . . . [For example], the services may draw on the **lawyer's recognized expertise** developed through the **regular practice of law** on behalf of **clients in matters involving** *a particular body of federal, nationally-uniform*, foreign, or international law."

*Id.*, Cmt. 14 (emphasis added).

As CoreLogic's ethicist notes, "most states do now permit out-of-state attorneys not licensed in the state to represent clients in arbitrations pending there, but the conditions for doing so vary." Burke-Spencer Decl., ECF No. 279-1 ¶ 9. For example, Plaintiffs' Counsel filed five (5) demands for arbitration in Arizona. *See*

---

[4] Available at https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/model_rules_of_professional_conduct_table_of_contents/.

-8-

ECF No. 273-18 at 4.  Arizona has adopted a less-restrictive version of Rule 5.5(c) which cabins its application to representation regarding state law issues. *See* Ariz. R. Prof. Cond. 5.5(c) (adding "that involve Arizona law" to the model rule). For cases involving federal law, like Plaintiffs' FLSA claims here, Arizona's rules provide:

> A lawyer admitted in another United States jurisdiction, or a lawyer admitted in a jurisdiction outside the United States, not disbarred or suspended from practice in any jurisdiction **may provide legal services in Arizona that exclusively involve federal law**, the law of another jurisdiction, or tribal law.

Ariz. R. Prof. Cond. 5.5(d) (emphasis added). Other states, such as Georgia, Illinois and Pennsylvania, have adopted the language of Model Rule 5.5(c)(3) without any additional filing requirements. *See* Ga. R. Prov. Cond. 5.5(c)(3); Ill. R. Prof. Cond. 5.5(c)(3); Pa. R. Prof. Cond. Rule 5.5(c)(3).  Plaintiffs filed nine (9) arbitration demands in Georgia, five (5) arbitration demands in Illinois, and four arbitration demands (4) in Pennsylvania. *See* ECF No. 273-18 at 4.

CoreLogic's ethicist opines that Counsel is obligated to comply with the applicable version of Model Rule 5.5(c) in the jurisdictions where Claimants filed arbitrations. *See* Burke-Spencer, Decl., ECF No. 279-1, ¶ 9. Tellingly, however, Ms. Burke-Spencer does not discuss any state-specific requirements outside of Florida (discussed *infra*), does not claim that Counsel violated any non-Florida rules, and does not opine that Counsel's filings run afoul of the Model Rules' permissive approach to out-of-state counsel representing clients in arbitration. **Neither Ms. Burke-Spencer nor CoreLogic advance any argument that Counsel engaged in the unauthorized practice of law for the 84 non-Florida arbitrations on which CoreLogic defaulted.[5]** This despite CoreLogic retaining

---

[5] Ms. Burke-Spencer opines that Counsel "would have been engaging in the unauthorized practice of law in violation of the ethical rules and statutes governing California lawyers if the jurisdiction did not permit out-of-state attorneys to [represent a Petitioner in an Out of State Arbitration] or that state's requirements for

-9-

Ms. Burke-Spencer **for the express purpose** of "assess[ing] the ethical issues arising from the 157 opt-in Plaintiffs' demands for arbitration filed in multiple U.S. jurisdictions (the '**Out of-State Arbitrations'**) as it relates to the potential for unauthorized practice of law." *Id.* ¶ 5. That Ms. Burke-Spencer was unwilling or unable to opine that Counsel engaged in the unauthorized practice of law as to the 84 non-Florida arbitrations speaks volumes.

CoreLogic has refused to arbitrate for over 6 months, pending resolution of several "threshold issues."[6] Now in position to justify its behavior to this Court—the very audience CoreLogic sought in its *ex parte* application months ago—CoreLogic explains its refusal to arbitrate solely based on the UPL issue, and its opposition only addresses 26 of the 110 arbitrations on which it defaulted. CoreLogic's failure to advance any specific argument as to the 84 non-Florida arbitrations is dispositive; CoreLogic has never had any legitimate basis to refuse to arbitrate those claims.

### D. There is no Support for the Argument that Delayed Filings in Florida Permanently Disqualifies Counsel

As previously discussed, CoreLogic originally charged Plaintiffs' Counsel with the unauthorized practice of law for failure to file Verified Statements required

---

doing so were not satisfied." Burke-Spencer Decl., ECF No. 279-1, ¶ 9. Without any evidence that Counsel failed to comply with applicable state requirements in the 84 non-Florida arbitrations, this tautological opinion adds nothing to the analysis.

[6] Indeed, CoreLogic's opposition now admits that two bases for its *ex parte* application asking this Court to enjoin the arbitrations (the statute of limitations and the consent forms) were properly issues for individual arbitrators. *See* Def. Mem., ECF No. 279 at 9, 22 (Noting that Court's holding that "issues of arbitrability (i.e., consent) and merits (statute of limitations) were to be resolved by the arbitrator," and noting it "absolutely agrees" that the statute of limitation is for the arbitrator). But any suggestion that CoreLogic came to this conclusion after the Court's *ex parte* ruling would be wrong. CoreLogic continued to press for administrative review of these issues in its first filing with the AAA after the Court rejected its *ex parte* request. *See* Helland Decl. Exh. 8, ECF No. 273-10.

by the Florida State Bar rules. Counsel had been holding those filings until AAA assigned case numbers to the files (a decision that proved reasonable given the response from Oregon), but began filing those forms immediately upon CoreLogic raising the issue. *See* ECF No. 218 at 10. Nevertheless, CoreLogic has argued that the short delay in filing these Verified Statements warrants dismissal of the arbitrations and justifies CoreLogic's failure to participate in those arbitrations. CoreLogic's argument is undermined by the fact that the Florida State Bar has been in possession of Plaintiffs' Verified Statements for months and has not raised any issues with the timing of Counsel's filing. While CoreLogic sees the timing as a matter of such importance that no arbitrations may proceed prior to a ruling about their timeliness, the State of Florida is apparently less concerned about the issue.[7]

The first Verified Statements were filed with the Florida State Bar on May 24, 2019. Helland Reply Decl. ¶2. Since that time, Plaintiffs' Counsel have submitted additional Verified Statements, and have contacted the Bar to confirm receipt. *Id.* Plaintiffs' Counsel have also followed up with the Florida Bar to provide AAA case numbers once those case numbers were assigned. *Id.*; Helland Reply Decl. Exh. 19. The Bar has never raised any concerns about Counsel's submissions. *Id.* On October 30, 2019, in response to Ms. Burke-Spencer's speculation that Counsel's actions "would appear" to violate Florida's rules (ECF No. 279-1), the undersigned called the Florida State Bar seeking further information about its policies and practices. Helland Reply Decl. ¶3. Counsel received a return call from Jeff Picker, an attorney with the Florida Bar. In response to the

---

[7] The response from the state of Oregon is enlightening. Upon receiving Counsel's out-of-state counsel form without a case number, a representative from the Oregon Bar contacted Counsel seeking that information *See* Helland Decl. Exh. 4, ECF No. 273-6. The representative asked that Counsel hold further filings until a case number was assigned. *Id.* CoreLogic no longer argues that Counsel's filing in Oregon was untimely or that Counsel engaged in the unauthorized practice of law there, *yet CoreLogic still defaulted on the Oregon arbitration. See* Helland Decl. Exh. 16, ECF No. 273-18 at 4.

undersigned's questions, Mr. Picker advised that the Florida rules are not precise as to when Verified Statements must be filed. *Id.* ¶ 2. Mr. Picker said that the Florida Bar does not have the authority to issue advisory opinions, and that there is no Supreme Court of Florida precedent on the question of whether a delay in the filing of a Verified Statement constitutes the unauthorized practice of law. *Id.* ¶ 2. Lastly, Mr. Picker advised that his office is principally concerned with tracking whether individual attorneys exceed the number of cases permitted by the rules. *Id.* ¶ 2.

For its part, CoreLogic has never cited any case authority holding that Plaintiffs' Counsel's decision to hold the filings until a case number was assigned violates the Florida rules, or that Florida views the timing of the filing as such an important issue that any filing delay would disqualify an attorney from continuing to represent a client in arbitration. Similarly, CoreLogic cites no authority for the idea that continued representation in Florida *after* filing a Verified Statement constitutes the unauthorized practice of law. As Mr. Picker explained, Florida's principal concern seems to be limiting the number of cases filed by out of state attorneys, and there is no dispute that Plaintiffs' Counsel complied with those requirements by limiting each attorney to three filings.

Ms. Burke-Spencer's declaration provides little help to CoreLogic on the Florida issues. Ms. Burke-Spencer does not claim to be an expert in Florida State Bar rules. *See*, *generally*, ECF No. 279-1. She provides no insight into Florida's policies or practices in enforcing its rules, and she cites no case authority, opinion letters, or other guidance on point. She therefore has no basis to opine that delayed filing of the Verified Statement "would appear" to violate Florida's rules. Moreover, Ms. Spencer does not even attempt to address whether the subsequent filing of a Verified Statement would cure any issues, or whether Florida would view a delayed filing as fully disqualifying of an attorney's right to practice in arbitration.

PLAINTIFFS' REPLY MEM. SUPP. MOT. FOR DEFAULT, JURISDICTION AND SANCTIONS

1  CoreLogic has torpedoed 110 properly-filed arbitrations because it believes

2  Counsel filed an administrative form with one state bar too late, in the process

3  turning a disagreement about state administrative practices and procedures into

4  overblown charges of unethical behavior. But CoreLogic provides no support for its

5  position that delayed filing of Counsel's Verified Statements justifies its refusal to

6  arbitrate in Florida—or anywhere else. The dispute about these administrative

7  forms did not warrant CoreLogic's default in 110 arbitrations.

8  **E. Sanctions are Warranted for CoreLogic's Violations of this**

9  **Court's Orders and its Bad Faith Litigation Tactics**

10  ***i.*  CoreLogic violated this Court's orders by refusing to**

11  **participate in the arbitration*s***

12  This Court's orders compelling arbitration applied to CoreLogic and

13  Plaintiffs equally, and CoreLogic willfully violated the Court's orders by

14  unilaterally exiting the arbitration process without justification. CoreLogic's willful

15  disobedience to this Court's orders warrants sanctions. As discussed thoroughly

16  above, CoreLogic points to no authority obligating Plaintiffs' Counsel to submit to

17  a special master for resolution of CoreLogic's UPL charges, yet CoreLogic readily

18  admits that it refused to participate in the arbitrations unless and until the AAA

19  resolved that threshold issue. Because CoreLogic had no basis to hold the

20  arbitrations hostage with its UPL charges, CoreLogic violated this Court's orders

21  requiring arbitration.

22  To be clear, Plaintiffs do not argue that CoreLogic violated an order to

23  arbitrate the UPL issue. *See* Def. Mem., ECF No. 279 at 22. And Plaintiffs do not

24  argue that the UPL issue was a gateway issue explicitly referred to arbitration in the

25  Court's order. *See id.* at 7.[8] Instead, Plaintiffs have argued throughout that neither

26

27  [8] This Court's order denying CoreLogic's *ex parte* application holds: "CoreLogic
   asked for resolution of any and all disputes by the arbitrator. Having compelled
28  arbitration, the Court will not now stay those proceedings due to associated costs."

the arbitration agreements nor the AAA rules permit CoreLogic to demand resolution of its "threshold issues" by the court, special master, or other extra-arbitral resolution mechanism prior to the appointment of arbitrators in the individual arbitrations.[9] Accordingly, CoreLogic violated this Court's orders compelling arbitration when it conditioned its participation in the arbitrations on Plaintiffs consenting to special master resolution of its UPL challenge. Neither this Court's orders nor the governing arbitration agreements allow CoreLogic to dictate the procedure in this way. CoreLogic's refusal to arbitrate therefore violated this Court's orders, and sanctions are warranted.[10]

### ii. *CoreLogic litigated in bad faith by refusing to arbitrate in non-Florida states without any support for its UPL allegations*

Sanctions are also appropriate because CoreLogic's refusal to arbitrate was in bad faith. CoreLogic charges Plaintiffs' Counsel with ethical violations in all 110 arbitrations filed outside of California and Minnesota, Def. Mem., ECF No. 279 at 14, but CoreLogic's opposition contains *no discussion* of the Rule 5.5(c)(4)

---

ECF No. 220. Whether that passages refers to CoreLogic's threshold disputes generally, or the consent form and statute of limitations specifically, does not matter. What matters is that the Court ordered arbitration, and CoreLogic refused to arbitrate.

[9] Plaintiffs have also maintained that the UPL issue might be outside the scope of the arbitration agreements, a point on which CoreLogic now apparently agrees.

[10] CoreLogic attempts to distract from its sanctionable conduct by citing to its other charges, disputes, and allegations in this litigation. *See* Def. Mem., ECF No. 279 at 14-15. Those issues are addressed elsewhere, and Plaintiffs will not separately address them here, except to note that there has never been any support for CoreLogic's allegation that Plaintiffs' Counsel filed arbitration demands without their clients' consent. Indeed, as Plaintiffs noted previously, Counsel has filed arbitration demands on a rolling basis over time, and not all Plaintiffs who were compelled to arbitration have filed. *See* ECF No. 218 at 2. If Counsel had been filing arbitration demands without consulting its clients, one would expect they would have done so in bulk and as to all Plaintiffs who were compelled to arbitration.

equivalents in states other than Florida, and CoreLogic provides no facts or argument that Plaintiffs' Counsel failed to comply with the rules of these states—rules its own ethical expert concedes generally allow out-of-state attorneys to practice in arbitration. CoreLogic sought an audience with this Court on an *ex parte* basis in May 2019 for resolution of this and other challenges, and it has relied on the UPL issue as its excuse for refusing to arbitrate in the months since then. But now, when CoreLogic is finally in front of its preferred audience, with its UPL allegations ripe for review, and after CoreLogic *hired an ethical expert to support its position*, CoreLogic cannot detail a single alleged violation for the 84 non-Florida arbitrations which it held hostage for months before finally defaulting. This is the very definition of bad faith litigation tactics. *See*, *e.g.*, *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) ("A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order.") (internal quotations and citations omitted).[11]

### iii.    *CoreLogic's flawed ethical justifications do not excuse its willful violation of this Court's orders*

Even CoreLogic's Florida opposition crumbles under scrutiny. As Plaintiffs' Counsel confirmed, a simple call to the Florida State Bar would reveal there is no authority establishing a definitive timeline for filing Verified Statements, and that the Florida Bar is principally concerned with tracking the number of arbitrations and court cases filed by out-of-state attorneys. CoreLogic has never had any

---

[11] In addition to granting sanctions, the Court would be fully justified in holding CoreLogic in civil contempt. *See In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1364 (9th Cir. 1987) ("Congress has determined that the power to hold a party in contempt is a discretionary power vested in the court whose order has been violated") (*citing* 18 U.S.C. § 401).

justification in case law, opinion letter, or other ethical guidance that a minor delay in filing a state bar Verified Statement is disqualifying and cannot be cured.

In search of any justification for its willful violation of this Court's orders, CoreLogic contends that its counsel's participation in any of these arbitrations would have constituted a violation of its own ethical obligations. There are several problems with that argument.

First, CoreLogic operates from the presumption that it has a right to its California Counsel defending each and every one of these arbitrations. From that false premise flows the flawed conclusion that CoreLogic has no obligation to defend itself if Carothers DiSante cannot appear. Of course that is not true. CoreLogic requested an order compelling each Plaintiff to arbitrate in the state where they worked, ECF No. 161 at 17, and a natural consequence of that request was that CoreLogic would have to defend itself in multiple jurisdictions. Defense Counsel's jurisdictional limitations—actual or fabricated—are no excuse for default.

Second, CoreLogic fails to identify any alleged ethical violations by Plaintiffs' Counsel in any state other than Florida. As such, even under CoreLogic's interpretation of Florida's rules, there would have been no ethical risk to Defense Counsel in appearing and defending the 84 non-Florida arbitrations on which CoreLogic defaulted. Obstructing proceedings with an argument that has no basis in fact or law constitutes bad faith litigation tactics.

Third, CoreLogic's refusal to arbitrate is based on the argument that, by even appearing in the arbitrations to *oppose* Plaintiffs' Counsel's representation of its clients, Defense Counsel would have been impermissibly *assisting* Plaintiffs' Counsel's unauthorized practice of law. This argument is non-sensical and absurd. It goes without saying that Defense Counsel has not assisted Plaintiffs' Counsel in anything in this litigation, and Defense Counsel certainly has not assisted Plaintiffs' Counsel's efforts to represent Plaintiffs in arbitration. A litigant in this Court may

-16-

not ignore the Court's local rules or the Federal Rules of Civil Procedure based solely on a licensing dispute with the opposing party's lawyer. The result is no different in arbitration. CoreLogic's counsel could have discharged any ethical obligation it had by appearing in the arbitrations and continuing to raise its arguments—either in front of the arbitrator or in whatever other forum was available.[12]

The *Brown* case from the Ninth Circuit stands for the proposition that CoreLogic may not refuse to arbitrate because of its unilateral belief that Plaintiffs' filings were improper. *See Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1010 (9th Cir. 2005) ("If Dillard's believed Brown's claim was meritless, its proper course of action was to make that argument in arbitration. Instead, Dillard's refused to participate in the arbitration process at all."). And *McLellan v. Fitbit, Inc.* recognizes that a party may not "exempt itself from arbitration whenever it 'rationally' prefers" to take a different course of action in the litigation. 2018 WL 3549042, at *6 (N.D. Cal. July 24, 2018). This case provides the Court another opportunity to confirm that an arbitration agreement is a two-way street, and that employers who elect to compel arbitration must continue with that process to its termination, for better or worse. The Court should sanction CoreLogic and/or its

---

[12] The final paragraph of Ms. Burke-Spencer's declaration repeats, several times over, the concept that counsel must not remain silent when counsel becomes aware of an ethical breach. *See* ECF No. 279-1, ¶ 10. But of course CoreLogic has not remained silent, and therefore CoreLogic's counsel has discharged any ethical obligation it had to raise the issue. The final causal link for CoreLogic's argument—that no lawyer could appear for CoreLogic with the UPL issue pending—ignores the fact that CoreLogic *has* raised the issue multiple times, to multiple audiences. Ms. Burke-Spencer's declaration fails to explain why a special master is now the correct audience when an arbitrator is not, or why CoreLogic could not participate under protest. The conclusory statement that it would be unethical for *any* lawyer to defend CoreLogic in these arbitrations is buried in an internal phrase in the last sentence of Ms. Burke-Spencer's declaration, and it does nothing to salvage CoreLogic's meritless opposition.

1  counsel for their willful disobedience to this Court's orders and for their bad faith

2  litigation tactics.

3  **F. CoreLogic's Insistence that it was Justified in Exiting Arbitration**

4  **Renders its Promise to Arbitrate Illusory and Unenforceable**

5  Lastly, Plaintiffs note that CoreLogic's opposition has serious implications

6  for the enforceability of its arbitration agreements in general, not just for its default

7  as to the Plaintiffs at issue here. CoreLogic argues throughout that it was fully

8  justified in refusing to arbitrate based on its preference to resolve its UPL

9  allegations prior to arbitrating on the merits. If it is true that CoreLogic's arbitration

10  agreements allow it to exit the arbitration process whenever it disagrees with the

11  AAA's administration, or when an employee's counsel refuses to submit a

12  tangential ethical challenge to a special master, then CoreLogic's promise to

13  arbitrate is illusory and non-mutual. And in California, a non-mutual, illusory

14  promise to arbitrate renders an arbitration agreement unenforceable and

15  unconscionable. *See Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1286 (9th Cir.

16  2006). Accordingly, this Court would be well within its rights to rule, as a matter of

17  law, that CoreLogic's arguments in this motion render its arbitration agreements

18  unenforceable. At the very least, the Court should order that CoreLogic file a copy

19  of its Order on this motion in all future cases where it seeks to compel arbitration,

20  so that future courts can determine whether CoreLogic's one-sided understanding

21  of its arbitration agreements renders them unenforceable.

22  **III.   CONCLUSION**

23  For all of these reasons, Plaintiffs request an order finding that CoreLogic defaulted

24  on its obligation to arbitrate and that the Court has retained jurisdiction over

25  Plaintiffs' claims because of that default. The Court should also sanction CoreLogic

26  and/or its counsel for violating this Court's orders and for litigating in bad faith. To

27  that end, Plaintiffs request an order permitting them to file a statement of their fees

28  and costs associated with opposing CoreLogic's motion to compel arbitration,

preparing and litigating the 110 arbitrations, and briefing this motion, so the Court

can impose the appropriate sanctions.

DATED: November 4, 2019         NICHOLS KASTER, LLP

By: */s/ Matthew C. Helland*
                                    Matthew C. Helland

BRYAN SCHWARTZ LAW

*Attorneys for Plaintiffs and Putative Class and
Collective Action Members*